STROUD, Judge.
 

 *270
 

 *492
 
 After the denial of his motions to suppress, defendant pled guilty to first degree murder; he appealed and also filed a motion for appropriate relief with this Court. In 2014, this Court allowed defendant's motion for appropriate relief, reversed the denial of his motions to suppress, and vacated his judgment. The State petitioned the Supreme Court for discretionary review and ultimately that Court vacated this Court's opinion and ordered that defendant's motion for appropriate relief be remanded for consideration by the trial court. On remand, the trial court denied defendant's motion for appropriate relief. Defendant now appeals the denial of his motion for appropriate relief. On defendant's appeal before us, because defendant's attorney made an objectively reasonable determination that defendant's uncle would qualify as his "guardian[,]" a term not defined in the applicable statutes, and therefore did not seek suppression of defendant's statement on that ground, he did not provide ineffective assistance of counsel in failing to argue his rights under North Carolina General Statute § 7B-2101(b), and his MAR was properly denied.
 

 Furthermore, during the remand, the Supreme Court specifically tolled the time for appeal of the motion to suppress with instructions for this Court to hear such appeal or terminate it, based upon the determination of defendant's MAR. Because defendant did not prevail with his MAR, we have also addressed his arguments regarding denial of his motions to suppress. Defendant argues he did not make a knowing and intelligent waiver of his rights during police interrogation. Because the trial court failed to address key considerations in determining whether defendant made a knowing and intelligent waiver, we remand the order denying defendant's motion to suppress for further findings of fact.
 

 I. Procedural Background
 

 Because this appeal addresses the interrogation of defendant and his attorney's effectiveness as counsel, we will not repeat the factual details of defendant's first degree murder charge and conviction but will instead focus on the procedural background of this case which led to this appeal. In 2007, defendant, age 13, provided a signed statement to the Lee County Sheriff's Office stating he had "shot the lady as she was sleeping on the couch in the head." Defendant's uncle, with whom defendant had been living, was present during the interrogation. On 14 August 2007-only two weeks after the interrogation-the trial court on its own motion entered an order appointing the director of the Lee County Department of Social Services as guardian of the person for defendant pursuant to North Carolina General Statute § 7B-2001. In the
 
 *493
 
 order appointing the guardian, the district court found that "the juvenile appeared in court with no parent, guardian or custodian but he lived with an uncle who did not have legal custody of him" and "[t]hat the mother of the juvenile resides in El Salvador and the father of the juvenile is no where to be found and based on information and belief lives in El Salvador." In 2009, defendant was indicted for first degree murder and was prosecuted as an adult.
 

 Although there was other evidence that defendant had shot the victim, his signed statement was the most direct evidence of premeditation as an element of first degree murder. Prior to his trial, defendant made separate motions to suppress his statements based upon alleged violations of his right to counsel and his right to remain silent and upon his claim he had not knowingly and voluntarily waived his Miranda rights. In December of 2012, the trial court denied defendant's motions to suppress, and the trial court found that defendant's uncle was present during the questioning; the uncle was defendant's custodian; an interpreter was provided; and neither defendant nor his uncle "indicated any lack of understanding of what was being said" when defendant agreed to waive his rights. In 2013, defendant pled guilty to first degree murder but preserved his right to challenge the denial of his motions to suppress.
 

 In 2014, defendant filed a motion for appropriate relief ("MAR") with this Court arguing he had been provided ineffective assistance of trial counsel because his attorney did not challenge the admission of his confession because his uncle was not his
 
 *271
 
 "parent, guardian, custodian, or attorney[,]" and therefore his rights under North Carolina General Statute § 7B-2101(b) were violated as no appropriate adult had been present during his custodial interrogation. In an unpublished opinion, this Court allowed defendant's MAR, reversed the denial of defendant's motions to suppress, and vacated defendant's judgment.
 

 The State petitioned for discretionary review, and our Supreme Court vacated the Court of Appeals' opinion and remanded the case to this Court for remand to the trial court to conduct an evidentiary hearing on the MAR; the entire Supreme Court order reads:
 

 This case has come before the Court by way of the State's Petition for Discretionary Review pursuant to N.C.G.S. § 7A-31.
 

 Pursuant to N.C.G.S. § 15A-1418, the decision of the Court of Appeals is vacated and this Court now ORDERS this case remanded to the Court of Appeals for remand to the Superior Court, Lee County, for an evidentiary hearing
 
 *494
 
 to make findings of fact necessary to determine whether the trial counsel's actions fell below an objective standard of reasonableness,
 
 see
 

 State v. McHone
 
 ,
 
 348 N.C. 254
 
 ,
 
 499 S.E.2d 761
 
 (1998) (remanding a motion for appropriate relief to the trial court with instructions to conduct an evidentiary hearing), and, if so, whether defendant was prejudiced by any deficient performance by his trial counsel.
 

 The time periods for perfecting or proceeding with the appeal are tolled. The Superior Court, Lee County, is ordered to transmit its order on the motion for appropriate relief within 120 days so that the Court of Appeals may proceed with the appeal or enter an order terminating the appeal, as appropriate.
 

 By order of the Court in Conference, this 24th day of September, 2015.
 

 State v. Benitez
 
 ,
 
 368 N.C. 350
 
 ,
 
 777 S.E.2d 60
 
 (2015).
 

 The trial court then held an evidentiary hearing on the MAR and entered an order with these findings of fact regarding defendant's uncle and his attorney's knowledge and investigation regarding his uncle's status:
 

 1. Attorney Fred D. Webb of Sanford, North Carolina, was duly appointed to represent the defendant upon the defendant being charged with murder in Juvenile Court in the District Court of Lee County and continued to represent the defendant through the Superior Court proceedings in Lee County wherein the defendant entered a plea agreement as is of record.
 

 ....
 

 4. Defendant's Uncle, Jeremias-Cruz, advised Mr. Webb that the defendant was Mr. Cruz's sister's son, and that by agreement with defendant's mother, the defendant had lived with him ever since the defendant came to North Carolina from El Salvador; for approximately 1 ½ years before the defendant was arrested. Defendant had no parent, custodian or guardian other than Jeremias Cruz living in the United States.
 

 5. Mr. Cruz provided the sole support for the defendant, had provided the defendant with his own room in Mr. Cruz's house, provided food for the defendant, provided clothing for the defendant, provided medical
 
 *495
 
 care for the defendant, enrolled the defendant in the Lee County school system and had otherwise provided all the needs of a juvenile the defendant's age.
 

 6. Attorney Webb had learned from the conferences with Mr. Cruz and with the defendant that Mr. Cruz had provided all the above referenced care for the defendant and had been accepted as a guardian by the Lee County School system to enroll the defendant in school.
 

 7. Attorney Webb had obtained documentation from the Lee County Schools and Lee County Health Department showing that Mr. Cruz had appeared before each of these entities and been accepted as the guardian of the defendant Juan C. Benitez.
 

 8. Mr. Cruz considered himself to have legal custody of the defendant since he had sole physical custody of the defendant by agreement with his sister and
 
 *272
 
 Mr. Cruz had advised others including Detective Brandon Wall on the day the defendant was arrested before the interview of defendant, that he was the defendant's uncle, that the defendant lived with him ..., that he was defendant's legal guardian or custodian and Juan had lived with him for about a year and a half and Mr. Webb had seen this in discovery provided by the State.
 

 9. The defendant's uncle Jeremias Cruz signed or was listed as a parent or guardian on numerous documents some of which are dated January 2006; those documents were obtained and received by Attorney Webb.
 

 ....
 

 12. After learning of the evidence of the relationship of Jeremias Cruz and the defendant, Attorney Webb had a member of his staff, early in his representation of the defendant, research the issue of who is a parent, guardian or custodian under NCGS 7B-2101, and Attorney Webb reviewed the cases of
 
 State v. Jones
 
 and
 
 State v. Oglesby
 
 as written by the Court of Appeals.
 

 ....
 

 *496
 
 15. Prior to the evidentiary hearing on defendant's Motion to Suppress Defendant's statement, Attorney Webb read the Supreme Court of North Carolina's opinion in
 
 State v. Oglesby.
 

 ....
 

 18. Attorney Webb, in the exercise of professional judgment, formed the opinion that
 
 Oglesby
 
 as decided by the Supreme Court was not inconsistent with the Court of Appeals opinion in
 
 Jones
 
 in that the same factors were discussed in determining if a person qualified as an approved person under NCGS 7B-2101, those factors being whether the person ever had custody of the juvenile, whether the juvenile stayed with or lived with the person for a considerable length of time, whether the person signed school paperwork, fed and clothed the juvenile, provided medical and other necessary care for the juvenile.
 

 19. Based upon the case law as interpreted by Attorney Webb and the facts of this case regarding the Uncle Jeremias Cruz and the defendant, Attorney Webb made the decision that Uncle Jeremias Cruz would be the appropriate person under 7B-2101 and believed his interpretation of the law as it existed was correct. Attorney Webb therefore did not identify or raise at the suppression hearing any issues as to whether Jeremias Cruz was the parent, custodian, or guardian of Defendant. On direct appeal, the Court of Appeals determined that Jeremias Cruz was not the "guardian" of the defendant.
 

 20. Attorney Webb's file does not contain any copy of, nor any reference to, the Court of Appeals decision in the case of
 
 In re M.L.T.H.
 
 Given the existence of
 
 Oglesby
 
 , counsel was not under any duty to find the
 
 M.L.T.H.
 
 opinion or the
 
 dicta
 
 contained in a footnote of that opinion stating that
 
 Oglesby
 
 "imp[l]iedly" overruled
 
 Jones.
 
 The decision in
 
 M.L.T.H.
 
 was filed in November, 2009, and did not become final until 2010....
 

 21. ... the evidence does not establish that Attorney Webb read
 
 M.L.T.H.
 
 before the hearing on the motion to suppress. The court finds as a fact that Attorney Webb was mistaken in his belief that he had reviewed
 
 M.L.T.H.
 
 prior to the suppression hearing....
 

 *497
 
 22. At the time of the suppression hearing[,] Attorney Webb knew that Jeremias Cruz had assumed responsibility for the care and upbringing of the defendant. Attorney Webb conducted a preliminary review of the cases and the law relating to the issue of who could be a "parent, guardian or custodian" under the applicable statute, including the Supreme Court's decision in
 
 Oglesby
 
 . These cases were understood by Attorney Webb, in the reasonable exercise of his best professional judgment, to support the conclusion, which was consistent with the realities of defendant's actual living situation, that Jeremias Cruz was acting as defendant's "guardian" within the meaning of N.C. Gen. Stat. 7B-2101....
 

 ....
 

 25. Attorney Webb's representation of defendant, viewed at the time of counsel's
 
 *273
 
 representation, and not merely through hindsight, was objectively reasonable.
 

 The trial court then concluded that Attorney Webb did not provide ineffective assistance of counsel as counsel's performance was not deficient nor was defendant prejudiced. The trial court denied defendant's MAR; it is from this order and the denial of defendant's motion to suppress that defendant's appeal is now before us.
 

 II. MAR
 

 Defendant argues the trial court erred when it denied his MAR. Defendant contends he did not receive effective assistance from his counsel because Attorney Webb failed to challenge his confession on the ground that an appropriate adult was not present during his interrogation.
 

 When considering rulings on motions for appropriate relief, we review the trial court's order to determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court. However, if the issues raised by Defendant's challenge to the trial court's decision to deny his motion for appropriate relief are primarily legal rather than factual in nature, we will essentially use a
 
 de novo
 
 standard of review in evaluating Defendant's challenges to the court's order.
 

 *498
 

 State v. Marino
 
 ,
 
 229 N.C. App. 130
 
 , 139-40,
 
 747 S.E.2d 633
 
 , 640 (2013) (citations, quotation marks, and brackets omitted).
 

 Defendant's MAR was based upon ineffective assistance of counsel, and thus we must also consider that standard.
 

 To obtain relief for ineffective assistance of counsel, the defendant must demonstrate initially that his counsel's conduct fell below an objective standard of reasonableness. The defendant's burden of proof requires the following:
 

 First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
 

 The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
 

 State v. Quick
 
 ,
 
 152 N.C. App. 220
 
 , 222,
 
 566 S.E.2d 735
 
 , 737 (2002) (citations and quotation marks omitted).
 

 Defendant does not challenge the trial court's findings of fact regarding his relationship with his uncle but only its conclusions of law regarding ineffective assistance of counsel.
 
 [1]
 
 We must first consider
 
 *499
 
 whether Attorney Webb's representation "was deficient" in that he "made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment."
 
 Quick
 
 ,
 
 152 N.C. App. at 222
 
 ,
 
 566 S.E.2d at 737
 
 .
 

 In his MAR, defendant contends that his trial counsel rendered IAC because an objectively reasonable attorney would have argued that no person approved by
 
 *274
 
 North Carolina General Statute § 7B-2101(b) was present when defendant was interrogated; defendant also contends that had his counsel made this argument, the trial court would have been obligated to suppress his statements and, further, defendant would not have pled guilty to first degree murder.
 

 North Carolina General Statute § 7B-2101 governs interrogation procedures of juveniles.
 
 See
 
 N.C.G.S. § 7B-2101. In 2007, when defendant was interrogated, the portion of the statute relevant to this issue provided as follows:
 

 (a) Any juvenile in custody must be advised prior to questioning:
 

 (1) That the juvenile has a right to remain silent;
 

 (2) That any statement the juvenile does make can be and may be used against the juvenile;
 

 (3) That the juvenile has a right to have a parent, guardian, or custodian present during questioning;
 

 and
 

 (4) That the juvenile has a right to consult with an attorney and that one will be appointed for the juvenile if the juvenile is not represented and wants representation.
 

 (b) When the juvenile is less than 14 years of age, no in-custody admission or confession resulting from interrogation may be admitted into evidence unless the confession or admission was made in the presence of the
 
 juvenile's parent, guardian, custodian, or attorney
 
 . If an attorney is not present, the parent, guardian, or custodian as well as the juvenile must be advised of the juvenile's rights as set
 
 *500
 
 out in subsection (a) of this section; however, a parent, guardian, or custodian may not waive any right on behalf of the juvenile.
 

 Id
 
 . (emphasis added).
 
 [2]
 

 This issue is based upon the definition of a "guardian" under North Carolina General Statute § 7B-2101(b) ; the applicable statutes do not define the term, and in our research we have not found any cases clearly defining that term as applied in this particular statute. But to determine if defendant's counsel made a legal error at all, we must consider how a person may qualify as a "guardian" under North Carolina General Statute § 7B-2101(b).
 
 [3]
 
 Most instructive on the term "guardian" in this context is
 
 State v. Oglesby
 
 wherein our Supreme Court determined the defendant's aunt was not his "guardian" within the meaning of North Carolina General Statute § 7B-2101 :
 

 Clearly, defendant was entitled by N.C.G.S. § 7B-2101(a)(3) to have a "parent, guardian, or custodian" present during his interrogation. However, an "aunt" is not an enumerated relation in the statute, and an interpretation of the term "guardian" to encompass anything other than a relationship established by legal process would unjustifiably expand the plain and unambiguous meaning of the word.
 
 See Black's Law Dictionary
 
 566 (abr. 7th ed. 2000) (defining "guardian" as "[o]ne who has the
 
 legal
 
 authority and duty to care for another's person or property" (emphasis added) ). We are bound by well-accepted rules of statutory construction to give effect to this plain and unambiguous meaning and we therefore decline any attempt to ascertain a contrary legislative intent.
 

 361 N.C. 550
 
 , 555-56,
 
 648 S.E.2d 819
 
 , 822 (2007).
 

 The State, citing
 
 State v. Jones
 
 ,
 
 147 N.C. App. 527
 
 ,
 
 556 S.E.2d 644
 
 (2001), points out that in construing the term "guardian" this Court had previously determined that the "[l]egal authority [described by Black's Law Dictionary] is not exclusively court-appointed authority, but is
 
 *501
 
 rather any authority conferred by the government upon an individual." The State also notes that the Court in
 
 Oglesby
 
 explained the defendant's particular relationship with his aunt indicating the factual circumstances could change the analysis.
 
 *275
 
 However, we agree with a prior panel's conclusion in dicta that the Supreme Court's decision in
 
 Oglesby
 
 implicitly overruled
 
 Jones
 
 :
 

 In
 
 State v. Jones
 
 ,
 
 147 N.C. App. 527
 
 , 538,
 
 556 S.E.2d 644
 
 , 651 (2001),
 
 disc. review denied
 
 ,
 
 355 N.C. 351
 
 ,
 
 562 S.E.2d 427
 
 (2002), this court held that presence of a thirteen year old defendant's aunt satisfied the requirements of N.C. Gen. Stat. § 7A-595, because the defendant lived with his aunt, "was dependent upon her for room, board, education, and clothing", and the aunt was "defendant's guardian within the spirit and intent of N.C.G.S. § 7A-595...." However, the aunt was not the defendant's legally appointed guardian or custodian.
 

 Id.
 

 at 539
 
 ,
 
 556 S.E.2d at 652
 
 . The North Carolina Supreme Court in
 
 State v. Oglesby
 
 expressly held that a person in the position of a guardian could
 
 not
 
 be treated as a guardian for purposes of N.C. Gen. Stat. § 7B-2101, impliedly overruling
 
 State v. Jones
 
 .
 

 In re M.L.T.H.
 
 ,
 
 200 N.C. App. 476
 
 , 486 n.6,
 
 685 S.E.2d 117
 
 , 124 n.6 (2009) (emphasis in original).
 

 In
 
 Oglesby
 
 , the Supreme Court did not simply reference "legal authority[,]" but rather narrowed the necessary inquiry into whether the relationship was one "established by legal process[.]"
 
 361 N.C. at 555-56
 
 ,
 
 648 S.E.2d at 822
 
 . We conclude that the Supreme Court's requirement of "legal process" necessarily means that the individual's authority was established through a court proceeding.
 
 See generally
 
 Black's Law Dictionary at 979, 1325 (9th ed. 2009) (noting for "legal process" "SEE PROCESS" and defining "process" as "[t]he proceedings in any action or prosecution"). However, we need not decide
 
 precisely
 
 what the Supreme Court meant by "legal process[,]"
 
 Oglesby
 
 ,
 
 361 N.C. at 555
 
 ,
 
 648 S.E.2d at 822
 
 , as we conclude that, at a minimum, the legal authority held by a "guardian," within the meaning of North Carolina General Statute § 7B-2101(b), requires authority gained through some legal proceeding.
 
 See
 

 id
 
 .;
 
 see also
 
 Black's Law Dictionary at 979, 1325.
 

 The trial court's unchallenged findings of fact on remand show that defendant's uncle had not obtained legal authority over defendant through any legal proceeding. The findings establish that defendant had lived with Mr. Cruz for at least a year, and Mr. Cruz was accepted as
 
 *502
 
 defendant's guardian by the school system and was listed on or signed several documents as defendant's parent or guardian; these findings are not sufficient to support a determination that Mr. Cruz was defendant's "guardian" for purposes of North Carolina General Statute § 7B-2101(b) ; thus, at the very least, there was a violation of the statute when law enforcement interrogated defendant with only his uncle present on his behalf.
 

 But an error of law alone is not sufficient to find ineffective assistance of counsel because
 

 the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.
 

 Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction
 
 *276
 
 or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's
 
 *503
 
 perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.
 

 Strickland v. Washington
 
 ,
 
 466 U.S. 668
 
 , 688-89,
 
 104 S.Ct. 2052
 
 ,
 
 80 L.Ed.2d 674
 
 , 693 (1984) (citations and quotation marks omitted).
 

 Here, in his MAR, defendant included an affidavit from his trial counsel acknowledging that his sole strategy in the trial court was to suppress defendant's statements to law enforcement and that his failure to argue a violation under North Carolina General Statute § 7B-2101(b) "was not a strategic decision on the part of counsel, but was the result of oversight." The trial court's findings on remand address the details of Attorney Webb's representation of defendant as follows:
 

 13. Attorney Webb's file contains a memorandum of law from his associate Monica Magnuson which references
 
 State v. Jones
 
 and the original Court of Appeals decision in
 
 State v. Oglesby
 
 .
 

 14. Attorney Webb's associate Monica Magnuson shepardized the decisions in
 
 State v. Jones
 
 ,
 
 147 N.C. App. 527
 
 ,
 
 556 S.E.2d 644
 
 (2001) and
 
 State v. Oglesby
 
 to check the validity of these cases.
 

 15. Prior to the evidentiary hearing on defendant's Motion to Suppress Defendant's statement, Attorney Webb read the Supreme Court of North Carolina's opinion in
 
 State v. Oglesby
 
 .
 

 16. The Supreme Court decision in
 
 Oglesby
 
 ,
 
 361 N.C. 550
 
 ,
 
 648 S.E.2d 819
 
 (2007), reversed the Court of Appeals decision suppressing a statement made by the accused; the Supreme Court allowed the use of the statement at trial. The Supreme Court in
 
 Oglesby
 
 did not mention
 
 State v. Jones
 
 anywhere in the majority opinion. The opinion did not expressly overrule
 
 Jones
 
 . The earlier decision in
 
 Jones
 
 is only discussed in the
 
 Oglesby
 
 dissent, which has
 
 *504
 
 no precedential value. Counsel did not read the dissent in
 
 Oglesby
 
 and did not thereby act unreasonably.
 

 17. Citing Black's Law Dictionary, the majority decision in Oglesby stated that the definition of a "guardian" for purposes of 7B-2101 was "one who has the authority and duty to care for another's person...." The Supreme Court went on to apply its definition of guardian to the facts of the case in a manner consistent with the test set forth in
 
 Jones
 
 :
 

 From the testimony of defendant's aunt, it is apparent that she never had custody of defendant, that defendant had only stayed with her on occasion but not for any considerable length of time, and that she had never signed any school papers for him..... Moreover, the only evidence which could possibly support a contrary finding of fact is the
 

 aunt's testimony that she was 'a mother figure' to defendant. However, this does not amount to the legal authority inherent in a guardian or custodial relationship.
 
 361 N.C. at 556
 
 ,
 
 648 S.E.2d 819
 
 .
 

 18. Attorney Webb, in the exercise of professional judgment, formed the opinion that
 
 Oglesby
 
 as decided by the Supreme Court was not inconsistent with the Court of Appeals opinion in
 
 Jones
 
 in that the same factors were discussed in determining if a person qualified as an approved person under NCGS 7B-2101, those factors being whether the person ever had custody of the juvenile, whether the juvenile stayed with or lived with the person for a considerable length of time, whether the person signed school paperwork, fed and clothed
 
 *277
 
 the juvenile, provided medical and other necessary care for the juvenile.
 

 19. Based upon the case law as interpreted by Attorney Webb and the facts of this case regarding the Uncle Jeremias Cruz and the defendant, Attorney Webb made the decision that Uncle Jeremias Cruz would be the appropriate person under 7B-2101 and believed his interpretation of the law as it existed was correct. Attorney Webb therefore did not identify or raise at the suppression hearing any issue as to whether Jeremias Cruz was the parent, custodian or guardian of Defendant. On direct appeal, the
 
 *505
 
 Court of Appeals determined that Jeremias Cruz was not the "guardian" of the defendant.
 

 20. Attorney Webb's file does not contain any copy of, nor any reference to, the Court of Appeals decision in the case of
 
 In re M.L.T.H
 
 . Given the existence of
 
 Oglesby
 
 , counsel was not under any duty to find the
 
 M.L.T.H.
 
 opinion or the
 
 dicta
 
 contained in a footnote of that opinion stating that
 
 Oglesby
 
 "impliedly" overruled
 
 Jones
 
 . The decision in
 
 M.L.T.H.
 
 was filed in November, 2009, and did not become final until 2010. Defendant Benitez was charged in this case in August, 2007. Attorney Webb was appointed to represent defendant in August 2007. The case proceeded through numerous hearings on competency, on transfer to Superior Court, and on defendant's motion to suppress before defendant entered his guilty plea. Defendant's case was thereafter appealed to the Court of Appeals. Attorney Webb's representation then terminated. Appellate counsel first raised the issue of Attorney Webb's alleged ineffective assistance of counsel on direct appeal. After the Court of Appeals decision in
 
 Benitez
 
 , petition for discretionary review was thereafter granted by the Supreme Court, and the case was remanded to the Superior Court of Lee County. On remand, Attorney Webb testified at the evidentiary hearing now in question in December of 2015. Attorney Webb has therefore been involved with this case for approximately eight and one half years. The length, complexity and procedural history of this case are sufficient to challenge the memory of any individual.
 

 21. The court is satisfied that Attorney Webb read
 
 In re M.L.T.H.
 
 at some time well before the MAR evidentiary hearing in December 2015. However, the evidence does not establish that Attorney Webb read
 
 M.L.T.H.
 
 before the hearing on the motion to suppress. The court finds as a fact that Attorney Webb was mistaken in his belief that he had reviewed
 
 M.L.T.H.
 
 prior to the suppression hearing. The court is completely convinced based on the evidence and on the court's opportunity to view and evaluate the demeanor of the witness that all of Attorney Webb's testimony was offered in good faith.
 

 22. At the time of the suppression hearing. Attorney Webb knew that Jeremias Cruz had assumed responsibility for
 
 *506
 
 the care and upbringing of the defendant. Attorney Webb conducted a preliminary review of the cases and the law relating to the issue of who could be a "parent, guardian or custodian" under the applicable statute, including the Supreme Court's decision in
 
 Oglesby
 
 . These cases were understood by Attorney Webb, in the reasonable exercise of his best professional judgment, to support the conclusion, which was consistent with the realities of defendant's actual living situation, that Jeremias Cruz was acting as defendant's "guardian" within the meaning of N.C. Gen. Stat. 7B-2101. Attorney Webb did not thereafter pursue the issue of whether Jeremias Cruz was defendant's "guardian", but engaged in extensive preparation and litigation of other issues relating to the admissibility of defendant's confession. These issues actually litigated during the defendant's case included whether defendant was competent to make a knowing, voluntary and intelligent waiver of his juvenile Miranda rights and whether sufficient interpretive services were provided to defendant during his interrogation. Attorney Webb offered expert evidence on and zealously pursued these issues.
 

 23. Defendant did not offer any expert or opinion testimony that Attorney Webb's performance fell below an objective standard of reasonableness. However, for purposes
 
 *278
 
 of this case, the court assumes that such evidence is not required.
 

 24. Defendant did not offer any evidence of "prevailing professional norms or of Bar Association standards or the like" which were violated by Attorney Webb in his representation of defendant. As such norms and standards are not determinative, but merely guides to evaluating what is reasonable under
 
 Strickland v. Washington,
 

 466 U.S. 668
 
 ,
 
 104 S.Ct. 2052
 
 ,
 
 80 L.Ed.2d 674
 
 (1984) and its progeny, the court assumes, without deciding, that specific evidence of such norms and standards is not required for defendant to meet his burden.
 

 25. Attorney Webb's representation of defendant, viewed at the time of counsel's representation, and not merely through hindsight, was objectively reasonable.
 

 *507
 
 The trial court then made the following conclusions of law:
 

 1. Attorney Webb's actions in not raising an argument in the motion to suppress that the defendant's statement at the Sheriff's Department should be suppressed because defendant did not have a parent, guardian, custodian, or attorney present were reasonable at the time and did not fall below an objective standard of reasonableness.
 

 2. In the alternative, even if Attorney Webb reviewed, or should have reviewed, the opinion in
 
 M.L.T.H.
 
 before the hearing on the motion to suppress, Attorney Webb's representation still did not fall below an objective standard of reasonableness.
 
 In re M.L.T.H.
 
 held that 7B-2101 required that a juvenile could not be advised that he had a right to have a "parent, custodian, guardian, attorney or
 
 any other person
 
 " present during custodial interrogation. There was no contention by either side in
 
 M.L.T.H.
 
 that the other person present during interrogation in fact met the definition of a "guardian". Further, the only express reference to the Supreme Court's decision in
 
 Oglesby
 
 overruling
 
 State v. Jones
 
 occurs in
 
 dicta
 
 in footnote 6 of
 
 M.L.T.H.
 
 Finally, the body of the
 
 M.L.T.H.
 
 opinion cites
 
 State v. Jones
 
 with apparent approval. ("Cases which have addressed this situation focus on the legal authority of the person over the juvenile. ... [citing
 
 Oglesby
 
 and
 
 State v. Jones
 
 ][ ) ]"
 
 In re M.L.T.H.
 
 ,
 
 200 N.C. App. 476
 
 , 488,
 
 685 S.E.2d 117
 
 (2009). These factors do not establish, either alone or in combination with the other facts found, that Attorney Webb's service, viewed from the perspective of that time, was objectively unreasonable.
 

 3. In the alternative, even if trial counsel's actions were objectively unreasonable, the defendant was not prejudiced by any deficient performance by his trial counsel. Defendant has not met his burden of showing that, had counsel's performance not been deficient, there is a reasonable probability that he would not have entered a guilty plea and received a sentence of life with parole.
 

 4. In the alternative, any violation of the defendant's statutory rights under NCGS 7B-2101 to have a parent, guardian, custodian, or attorney present under the facts stated herein would not be a substantial violation warranting suppression of the statement pursuant to NCGS 15A-974.
 

 *508
 
 Thus, the trial court did not find that defendant's trial counsel had a strategic reason for failing to file a motion to suppress based upon North Carolina General Statute § 7B-2101 but instead that his actions were objectively reasonable at the time-considering the state of the law-and that he acted diligently and in good faith in his representation of defendant. The trial court's findings of fact demonstrate the court's efforts "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."
 
 Strickland
 
 ,
 
 466 U.S. at 689
 
 ,
 
 104 S.Ct. at 2065
 
 ,
 
 80 L.Ed.2d at 694
 
 . Defendant's trial counsel did make a legal error, but it was not an "objectively unreasonable" error at the time.
 
 [4]
 
 Because we have determined that the trial
 
 *279
 
 court correctly concluded that defendant's counsel's representation was "reasonable at the time and did not fall below an objective standard of reasonableness[,]" we need not address the trial court's alternative conclusions of law regarding prejudice and lack of a substantial violation of defendant's rights under North Carolina General Statute § 15A-974. The MAR order is affirmed.
 

 III. Motion to Suppress
 

 Because defendant did not prevail on his current appeal of his MAR and the Supreme Court left the jurisdiction of this Court open to consider defendant's original appeal of his motion to suppress, we now turn to that appeal. We also turn back to defendant's 2014 brief and his reply brief for the basis of his argument regarding the denial of his motion to suppress. Defendant did file a supplemental brief and a supplemental reply brief in 2016, but the focus of those briefs is the second appeal regarding the MAR.
 

 Defendant made three arguments in his 2014 briefs in the appeal of his motion to suppress. Most of defendant's brief was devoted to his primary argument regarding violation of his rights under North Carolina General Statute § 7B-2101(b), but we have already addressed that argument in relation to the trial court's order on remand for the MAR. Defendant's second argument was that "the trial court erred by denying ... [defendant's] motion to suppress his statement at the Lee
 
 *509
 
 County Sheriff's Department because his waiver of right was not knowing and intelligent." (Original in all caps.) Defendant's third argument is related to the second: in the alternative, he contends that "the trial court erred by failing to make findings of fact to resolve material conflicts in the evidence" regarding whether defendant "knowingly and intelligently waived his rights." (Original in all caps.) Since both of defendant's remaining arguments address the trial court's findings of fact regarding knowing and voluntary waiver and the sufficiency of the evidence to support those findings, we will address them together.
 

 North Carolina General Statute § 7B-2101(d) includes an additional requirement before evidence of a statement by a juvenile may be admitted as evidence: "Before admitting into evidence any statement resulting from custodial interrogation, the court shall find that the juvenile knowingly, willingly, and understandingly waived the juvenile's rights." N.C. Gen. Stat. § 7B-2101(d) (2007).
 

 To determine if a defendant has "knowingly and voluntarily" waived his right to remain silent, the trial court must consider the totality of the circumstances of the interrogation, and for juveniles, this analysis includes the "juvenile's age, experience, education, background, and intelligence, and [evaluation] into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights":
 

 [T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.
 

 This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits-indeed, it mandates-inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings
 
 *510
 
 given him, the nature of his Fifth Amendment
 
 *280
 
 rights, and the consequences of waiving those rights.
 

 Fare v. Michael C.
 
 ,
 
 442 U.S. 707
 
 , 724-25,
 
 99 S.Ct. 2560
 
 , 2571-72,
 
 61 L.Ed.2d 197
 
 , 212 (1979) (citations and quotation marks). Defendant argues that the trial court failed to make sufficient findings of fact to address the factors required by the "totality-of-the-circumstances approach" mandated by the United States Supreme Court.
 

 Id.
 

 at 725
 
 ,
 
 99 S.Ct. at 2571-72
 
 ,
 
 61 L.Ed.2d at 212
 
 . This approach requires "inquiry into all of the circumstances surrounding the interrogation" and "evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights."
 

 Id.
 

 Furthermore,
 

 A child's age is far more than a chronological fact. It is a fact that generates commonsense conclusions about behavior and perception. Such conclusions apply broadly to children as a class. And, they are self-evident to anyone who was a child once himself, including any police officer or judge.
 

 Time and again, this Court has drawn these commonsense conclusions for itself. We have observed that children generally are less mature and responsible than adults; that they often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them; that they are more vulnerable or susceptible to outside pressures than adults. Addressing the specific context of police interrogation, we have observed that events that would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. Describing no one child in particular, these observations restate what any parent knows-indeed, what any person knows-about children generally.
 

 J.D.B. v. North Carolina
 
 ,
 
 564 U.S. 261
 
 , 272-73,
 
 131 S.Ct. 2394
 
 , 2403,
 
 180 L.Ed.2d 310
 
 , 323-24 (2011) (citations, quotation marks, and ellipses omitted).
 

 Defendant does not challenge any of the trial court's findings of fact in the order denying his motion to suppress, so all of its findings are binding on appeal.
 
 See
 

 State v. Osterhoudt
 
 ,
 
 222 N.C. App. 620
 
 , 626,
 
 731 S.E.2d 454
 
 , 458 (2012) ("Any unchallenged findings of fact are deemed to be supported by competent evidence and are binding on appeal."
 

 *511
 
 (citation and quotation marks omitted) ). As to binding findings of fact, we must note at the outset that defendant's competency to stand trial was an issue in this case; ultimately, in 2012, the trial court entered an order determining defendant was competent to stand trial. In addition, all of the testimony and evidence from the competency hearing was also admitted for purposes of the hearing on the motion to suppress which is at issue in this appeal. The competency order found:
 

 3. That the Defendant does suffer from a mental illness or defect however there is insufficient evidence with respect to the requirement of adaptive functioning to determine the exact nature of that mental illness or defect as regard to those prongs of the test for mental retardation.
 

 4. The Court further finds that based upon testimony of Brian David, a supervisor at the Richmond Detention Center that the Defendant gets along well with the other inmates, communicates well, and serves as a Trustee at the facility.
 

 5. That the Defendant has shown the ability to respond in a reasonable and rational manner to questions regarding the proceedings, and the Defendant[']s situation, and the ability to assist defense counsel.
 

 At the time of the competency order, defendant would have been 18 years old and thus an adult, but he was 13 at the time of the interrogation, so the determination of defendant's competency has little weight in the analysis of defendant's knowing and intelligent waiver at age 13.
 
 [5]
 
 But the finding
 
 *281
 
 that defendant "suffer[s] from a mental illness or defect" but does not meet the "test for mental retardation" is a relevant finding of fact which we cannot ignore when reviewing the denial of defendant's
 
 *512
 
 motion to suppress based upon a knowing and intelligent waiver of his rights.
 
 [6]
 

 Based upon the record and the extensive evaluations of defendant, it appears defendant's "mental illness or defect" existed since before defendant was age 18 and the "mental illness or defect" is relevant to any consideration of his "experience, education, background, and intelligence, and [ ] whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights."
 
 Fare
 
 ,
 
 442 U.S. at 725
 
 ,
 
 99 S.Ct. at 2571-72
 
 ,
 
 61 L.Ed.2d at 212
 
 . The competency order's finding did not identify the "mental illness or defect" or describe its impact upon defendant's abilities or understanding but seems only to have determined that defendant did not meet "the test for mental retardation."
 

 Much of the order denying defendant's motion to suppress is devoted to law enforcement's initial encounters with defendant, leading up to his "transfer" to the Sheriff's Office. As to the interrogation, the order then finds:
 

 12. Lee County Detective Clint Babb met with Defendant's Uncle Jeremiah Cruz who was the Defendant's custodian, the Defendant, and Spanish interpreter Celinda Carney at the Lee County Sheriff's Office.
 

 13. The Defendant who was 13 years old at the time was duly advised of his juvenile rights in the presence of his uncle and the juvenile rights were interpreted by Celinda Carney. Celinda Carney was retained by the Lee County Sheriff's Office to assist them with interpreting in this matter. Celinda Carney had never interpreted in a criminal matter before.
 

 *513
 
 14. Detective Babb and Ms. Carney testified the Defendant understood all questions asked and Defendant responded appropriately to all questions.
 

 15. The Defendant acknowledged he understood each right read to him and initialed each one to indicate he understood each item as shown on the rights form admitted to evidence.
 

 16. The Defendant agreed to waive his rights and signed the waiver indicating same. Neither Defendant nor [hi]s uncle at anytime indicated any lack of understanding of what was being said.
 

 17. The Defendant began responding to questions and at some point advised Detective Babb through the interpreter Ms. Carney that he would tell Ms. Carney what happened but not Detective Babb.
 

 *282
 
 18. Detective Babb advised Ms. Carney to tell the Defendant whatever he told Ms. Carney she was going to tell Detective Babb and Ms. Carney did so and the Defendant agreed to tell her anyway. Detective Babb left the interview room leaving the Defendant with Ms. Carney.
 

 19. Defendant told Ms. Carney the information contained in his written signed statement after Detective Babb left the room and she relayed same to Detective Babb as she indicated she would.
 

 20. Detective Babb went over what the Defendant told Ms. Carney with the Defendant and Defendant agreed that it was correct.
 

 21. The Defendant told the same story again in the computer room, Defendant was read the statement again from the computer screen and Ms. Carney read the statement to the Defendant in printed form, and the defendant acknowledged the statement as accurate and signed it, and the Defendant's uncle was present with him throughout the process.
 

 22. Each witness indicated that the Defendant was never threatened, coerced or otherwise harassed and all conversations were done in a conversational tone without yelling.
 

 *514
 
 23. None of the witnesses in the presence of the Defendant from the point of contact with the Defendant saw any signs of the Defendant being confused or otherwise not understanding what was being asked or instructed.
 

 The findings of fact in the motion to suppress
 
 do
 
 address defendant's age and "the circumstances surrounding the interrogation[,]" but not defendant's "experience, education, background, and intelligence" or "whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."
 

 Id.
 

 The absence of findings regarding defendant's "experience, education, background, and intelligence" and "capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights[,]"
 
 id
 
 ., is especially concerning since the trial court had already found defendant suffers from an unnamed "mental illness or defect" and had before it "all of [the] testimony and evidence" from the competency hearing, including an evaluation from Dr. Antonio Puente in 2008 when defendant was only 14 years old. Dr. Puente's evaluation was the first done, when defendant was not much older than at the time of the interrogation. Dr. Puente found "the diagnosis is mild retardation with organic deficits limiting his ability to understand and appreciate the complexities involved with the alleged incident, as well as his own legal situation." Dr. Puente also did a follow-up evaluation in 2011, again diagnosing defendant with "Mild Mental Retardation." Because all of the testimony and evaluations presented at the competency hearing were included as part of the evidence for the hearing on the motion to suppress, the trial court had before it
 
 extensive
 
 evidence regarding defendant's "experience, education, background, and intelligence" and "capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights."
 

 Id.
 

 The trial court must evaluate the evidence, consider its weight, and make the required findings, but here it simply did not.
 
 See generally
 

 id.
 

 ,
 
 442 U.S. at 724-25
 
 ,
 
 99 S.Ct. at 2571-72
 
 ,
 
 61 L.Ed.2d at 212
 
 .
 

 This case has gone on for a long time. When it started, defendant was a 13 year old child. When defendant entered his plea, he was nearing his 20
 
 th
 
 birthday. At the time of the filing of this opinion, defendant is 24 years old. Nonetheless, we must remand for the trial court to make additional findings of fact addressing whether defendant's waiver of rights
 
 at age 13
 
 was knowing and intelligently made, taking into account the evidence regarding defendant's "experience, education, background, and intelligence" and evaluation of "whether he has the capacity to
 
 *515
 
 understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights."
 

 Id.
 

 These considerations under
 
 Fare
 
 are not technicalities but are essential to any conclusion of whether defendant knowingly and
 
 *283
 
 intelligently waived his right to remain silent.
 
 See generally
 
 id.
 

 The trial court's order did not properly address the constitutional arguments before it in defendant's motion to suppress, and thus remand is necessary at this late stage in defendant's ongoing criminal proceedings. Certainly the trial court may consider later evaluations and events in its analysis of defendant's knowing and intelligent waiver at age 13 but should take care not to rely too much on hindsight. Hindsight is reputed to be 20/20, but hindsight may also focus on what it is looking for to the exclusion of things it may not wish to see. The trial court's focus must be on the relevant time period and defendant's circumstances at that time as a 13 year old boy who required a translator and who suffered from a "mental illness or defect" and not on the 10 years of litigation of this case since that time. The trial court must make findings as to defendant's mental state and capacity to understand the
 
 Miranda
 
 warnings at age 13, including the nature of his "mental illness or defect[,]" and the impact, if any, this condition had on his ability to make a knowing and intelligent waiver.
 
 See generally
 
 id.
 

 IV. Conclusion
 

 Although defendant's trial counsel made a legal error by not seeking suppression of defendant's statement based upon his wrongful determination that defendant's uncle was his "guardian" as defined by North Carolina General Statute § 7B-2101, and thus a proper person to be present during his interrogation, the trial court correctly determined on remand that this error was objectively reasonable at the time. We affirm the order denying defendant's MAR.
 

 Because the trial court failed to address the key considerations in determining whether defendant had knowingly and intelligently waived his rights during police interrogation, we must remand the order denying defendant's motion to suppress for further findings of fact. We note that both the State and defendant have already presented evidence regarding these issues, but if either the State or defendant should request that the trial court allow presentation of further evidence or argument on remand, the trial court may in its sole discretion either allow or deny this request.
 

 AFFIRMED in part; REMANDED in part.
 

 Chief Judge McGEE and Judge TYSON concur.
 

 [1]
 

 Defendant's brief does mention three findings of fact made in the order denying defendant's motion to suppress, regarding whether defendant knowingly and intelligently waived his rights, and we will address those findings of fact as necessary in the portion of this opinion addressing the motion to suppress. Defendant then extends his argument regarding the order denying his motion to suppress by claiming that order was not sufficient, and thus on remand the trial court should have made more factual findings addressing the insufficiency of that order. But the trial court did not have jurisdiction on remand to reconsider defendant's motion to suppress and any "insufficienc[ies]" in it. The Supreme Court specifically remanded to the trial court for consideration of the MAR. The Supreme Court also tolled the time of appeal of the motion to suppress based upon the determination made in the MAR. Thus, ultimately, the trial court only had jurisdiction to address the MAR while this Court has both the jurisdiction to address the original appeal of the motion to suppress and the MAR now appealed.
 

 [2]
 

 Subsection (b) of North Carolina General Statute § 7B-2101 was amended in 2015 to raise the age from 14 to 16;
 
 see
 
 N.C. Gen. Stat. § 7B-2101, Editor's Note (2017), under either version of the statute, defendant fell within the protection of subsection (b).
 

 [3]
 

 We have adopted some of the following analysis nearly verbatim from the vacated Benitez opinion.
 
 See
 

 State v. Benitez
 
 ,
 
 238 N.C. App. 363
 
 ,
 
 768 S.E.2d 201
 
 (Dec. 31, 2014) (No. COA14-542) (unpublished) ("
 
 Benitez I
 
 ");
 
 vacated
 
 ,
 
 368 N.C. 350
 
 ,
 
 777 S.E.2d 60
 
 (2015).
 

 [4]
 

 We also note the trial court's finding that "[d]efendant did not offer any expert or opinion testimony that Attorney Webb's performance fell below an objective standard of reasonableness. However, for purposes of this case, the court assumes that such evidence is not required." We agree expert evidence is not necessarily required for every claim of IAC, though we note some evidence from practicing attorneys as to the standards of practice is often helpful, particularly in cases such as this where the issue is the interpretation of case law rather than a more blatant error such as a failure to prepare for a hearing at all.
 

 [5]
 

 Defendant devotes a substantial part of his argument to the background of his competency evaluation leading up to the hearing and order regarding his competency to stand trial, but we will not address this in detail. The competency order was not appealed and in the suppression order on appeal, the trial court was considering a different question. It does not appear the trial court heavily relied on the competency order in its order denying defendant's motion to suppress, but even if it did rely in part on the competency order, neither order addressed defendant's "experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights" at the time of the interrogation when he was 13.
 
 Fare
 
 ,
 
 442 U.S. at 725
 
 ,
 
 99 S.Ct. at 2571-72
 
 ,
 
 61 L.Ed.2d at 212
 
 .
 

 [6]
 

 To be accurate we have used the terminology as used in the record of this case, but we note that the terminology used by mental health professionals for mental retardation has changed since the 2012 order was entered. The United State Supreme Court noted in 2014 that "[p]revious opinions of this Court have employed the term "mental retardation." This opinion uses the term "intellectual disability" to describe the identical phenomenon. See Rosa's Law,
 
 124 Stat. 2643
 
 (changing entries in the U.S. Code from "mental retardation" to "intellectual disability"); Schalock et al., The Renaming of
 
 Mental Retardation
 
 : Understanding the Change to the Term
 
 Intellectual Disability
 
 , 45 Intellectual & Developmental Disabilities 116 (2007). This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts;" the manual is often referred to by its initials "DSM," followed by its edition number,
 
 e.g.
 
 , "DSM-5." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013)."
 
 Hall v. Florida
 
 , 572 U.S. ----, ----,
 
 134 S.Ct. 1986
 
 , 1990,
 
 188 L.Ed.2d 1007
 
 , 1014 (2014).