IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-261

No. COA20-766

Filed 19 April 2022

Lee County, No. 09CRS001227

STATE OF NORTH CAROLINA

v.

JUAN CARLOS BENITEZ, Defendant.

Appeal by defendant from judgment entered on or about 20 May 2013 by Judge Douglas B. Sasser and order entered on or about 8 August 2019 by Judge C. Winston Gilchrist in Superior Court, Lee County. Heard in the Court of Appeals 16 November 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General Michael T. Henry, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Anne M. Gomez, for defendant-appellant.*

STROUD, Chief Judge.

¶ 1 Defendant appeals a trial court order entered upon remand which denied his motions to suppress. On remand, the trial court properly conducted review as directed by *State v. Benitez*, 258 N.C. App. 491, 813 S.E.2d 268 (2018), addressed the totality of the circumstances relevant to defendant's statements to law enforcement, and concluded defendant knowingly and voluntarily waived his *Miranda* rights. We

therefore affirm the trial court's order denying defendant's motions to suppress.

## I. Procedural Background

This case has a lengthy procedural history with the trial court, this Court, and the Supreme Court. *See State v. Benitez*, 258 N.C. App. 491, 813 S.E.2d 268 (2018) ("*Benitez I*").[1]

### A. Prior *Benitez I* Appeal

The procedural background in this case was provided in *Benitez I*:

> After the denial of his motions to suppress, defendant pled guilty to first degree murder; he appealed and also filed a motion for appropriate relief with this Court. In 2014, this Court allowed defendant's motion for appropriate relief, reversed the denial of his motions to suppress, and vacated his judgment. The State petitioned the Supreme Court for discretionary review and ultimately that Court vacated this Court's opinion and ordered that defendant's motion for appropriate relief be remanded for consideration by the trial court. On remand, the trial court denied defendant's motion for appropriate relief. Defendant now appeals the denial of his motion for appropriate relief.

---

[1] We note that there was also a *State v. Benitez*, 810 S.E.2d 781 (N.C. App. 2018), opinion filed on 6 February 2018. The 6 February 2018 opinion was withdrawn prior to the issuance of the Court's mandate by order entered 19 February 2018, and replaced with State v. Benitez, 258 N.C. App. 491, 813 S.E.2d 268 (2018), filed on 20 March 2018. It is unclear to this Court why the withdrawn February 2018 opinion was published in West's South Eastern Reporter. Regardless, the March 2018 opinion is the official opinion of this Court as "[t]he North Carolina Reports and the North Carolina Court of Appeals Reports remain the official reports of the opinions of the Supreme Court of North Carolina and of the North Carolina Court of Appeals, respectively." Administrative Order Concerning the Formatting of Opinions and the Adoption of a Universal Citation Form, 373 N.C. 605 (2019).

*Id.* at 492, 813 S.E.2d at 270.

¶ 4          In *Benitez I*, we addressed defendant's motion for appropriate relief ("MAR") and motions to suppress. *See id.*, 258 N.C. App. 491, 813 S.E.2d 268. As to the MAR, we affirmed the trial court's ruling to deny that motion. *See id.* As to the motions to suppress, we remanded:

> Because the trial court failed to address the key considerations in determining whether defendant had knowingly and intelligently waived his rights during police interrogation, we must remand the order denying defendant's motion to suppress for further findings of fact. We note that both the State and defendant have already presented evidence regarding these issues, but if either the State or defendant should request that the trial court allow presentation of further evidence or argument on remand, the trial court may in its sole discretion either allow or deny this request.

*Id.* at 515, 813 S.E.2d at 283.

**B.     Trial Court Order Upon Remand from *Benitez I***

¶ 5          Thus, on or about 8 August 2019, the trial court again considered defendant's motions to suppress. The trial court noted that "[n]either the State nor the [d]efendant chose to submit additional evidence[.]" Ultimately, regardless of the extensive procedural history of this case, the only issue presently before this Court is the 2019 order denying defendant's motions to suppress, which was based solely upon evidence from prior hearings, and entered on remand for the trial court to address

"the key considerations in determining whether defendant had knowingly and intelligently waived his rights during police interrogation[.]" *Id.*

¶ 6        The trial court began its order by incorporating two findings of fact from its prior orders and evidence:

> 1.        This Court's prior order entitled, <u>"ORDER DENYING MOTIONS TO SUPRESS STATEMENT"</u>, signed on December 13, 2012 is hereby incorporated by reference in its entirety.
>
> 2.        Evidence admitted at the hearing on Defendant's capacity to proceed, held on May 2nd and 3rd 2012, was stipulated into evidence by the parties at the October 4, 2012 hearing on Defendant's Motion to Suppress Statement.

¶ 7        The trial court then made findings of fact regarding the circumstances of defendant's statement to law enforcement:

> 1.        Defendant was in custody at the Lee County Sheriff's Office when he made his statement through the interpreter with his uncle present.
>
> 2.        The length of Defendant's interrogation was just under two and one half (2 ½) hours in that he was advised of his rights under NCGS § 7B-2101 at 10:30 p.m. on August 1, 2007 and his typed, signed statement was completed at 12:56 a.m. on August 2, 2007.
>
> 3.        There was no credible evidence that the Defendant was tired or fatigued during the time that he was questioned and made his statement.
>
> 4.        In the making and reviewing of his statement, the Defendant related a consistent version of events.

5.      The interpreter, Celinda Carney, had experience in working with children at the local domestic abuse shelter.

6.      Defendant understood all questions asked and statements made to him. Defendant responded coherently to all questions. The interpreter present during Defendant's interrogation accurately translated the juvenile Miranda rights given into Spanish for Defendant. The interpreter accurately translated the questions asked of Defendant as well as all of Defendant's statements. The interpreter experienced no difficulty in translating for Defendant.

7.      Defendant was never threatened, coerced or otherwise harassed and all conversations were done in a conversational tone without yelling.

¶ 8      The trial court then made several findings of fact about defendant's

background, education, and experience:

8.      Defendant was born in El Salvador, Central America and came to the United States in 2005. Defendant was transported to the United States at the behest of his family by a "coyote", a person hired to smuggle undocumented immigrants into the United States. Defendant experienced physical abuse while living in El Salvador. Defendant reported receiving blows to the head in El Salvador.

9.      At the time the Defendant gave his statement, while still in his thirteenth (13th) chronological year, he was actually just two (2) months and a day shy of his fourteenth (14th) birthday.

10.     After coming to the United States, the Defendant had been enrolled in and attending public school in the English as a Second Language program in Lee County, North Carolina for at least one (1) year.

11. In a school setting for ESL (English as a Second Language), prior to interrogation, Defendant responded to simple directions with appropriate actions.

12. Two (2) months prior to making his statement the Defendant had been promoted to the eighth (8th) grade, a grade level appropriate for his age. In the school year before this incident, Defendant achieved grades of 70 or above in Language Arts 7, Math 7, Art, Technology and Health and P.E. Notes for one of Defendant's classes contained in Defendant's school records for 2007, the year of this offense, state that "This student does not pay attention during class." During the 2006-2007 school year, Defendant exhibited poor disciplinary behavior, such as disrespecting his teachers, use of profanity, calling a female student a bitch, touching a female student's buttocks, tripping another student and skipping class. Defendant was placed in in-school suspension four times and out of school suspensions were imposed three times during the 2006-2007 school year. Defendant's conduct likely affected his school performance to some degree.

13. Defendant reported to Dr. Bartholomew that he had been "caught in a stolen car with a friend" in a prior incident which occurred before his arrest for first degree murder in the case at bar and that he had received criminal charges as a result. However, there is no credible evidence before the court that Defendant was advised of his Miranda rights for any prior incidents.

14. Defendant was riding a bicycle alone on or near a street outside the mobile home park where he lived when he was first encountered by law enforcement on August 1, 2007.

15. Defendant has exhibited manipulative behavior that was goal oriented and rewarding to him.

¶ 9        The trial court then made findings regarding defendant's mental state, mental capabilities, and his intelligence level:

> 16.    Defendant had Intelligence Quotient (IQ) scores of 44, 60 and 65 from a number of IQ tests and screenings. However, the score of 44 was inconsistent with the other evidence of Defendant's intellectual or cognitive abilities and did not reflect Defendant's actual level of intelligence or intellectual function. Defendant's full scale IQ score on the Wechsler Adult Intelligence scale Mexican version (administered in Spanish) was 60. No examiner conducted a credible formal assessment of Defendant's adaptive skills.
>
> 17.    Dr. Antonio Puente, Ph. D., an expert witness called on behalf of Defendant, opined that Defendant was "mildly retarded".
>
> 18.    The totality of the credible evidence does not support a finding that Defendant suffered from significant limitations in adaptive functioning in two or more adaptive skill areas. The totality of the credible evidence does not support a finding that Defendant had significant limitations in communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills or work skills at the time he was questioned by law enforcement.
>
> 19.    Dr. Richard Rumer, Ph. D., who was recognized as an expert in forensic and clinical psychology, credibly testified that Defendant did not "function in the extremely low range of functioning." Dr. Rumer credibly testified that Defendant was not "mentally retarded" or intellectually disabled. Among other things, Defendant scored an 84, at the 17th percentile for his chronological peers, on a subtest of non-verbal intelligence.
>
> 20.    The trial court carefully observed the demeanor of

Dr. Puente and considered the time frame and context of his evaluations and testing. Some of Dr. Puente's testimony on behalf of Defendant was exaggerated or inaccurate. His opinions lacked credibility.

21.     Among other things, Dr. Puente testified that the results of his testing of Defendant reflected Defendant lacked "the ability to understand English at all." This opinion was contradictory to credible evidence regarding Defendant's ability to understand some English at the time of his arrest. Dr. Puente's opinion was not credible.

22.     Among other things, Dr. Puente stated that Defendant's "understanding of Spanish was very rudimentary", that his comprehension of Spanish, the Defendant's native tongue, "was closer to about pre-kindergarten levels" and that "he barely knew Spanish". These conclusions by Dr. Puente were contradicted by the totality of the credible evidence presented. These conclusions by Dr. Puente were not credible.

23.     Dr. Puente's own testimony showed that by one measure, Defendant's spoken vocabulary, his ability to say words, was as high as fifteen years of age.

24.     Defendant exhibited "varied" and "less than optimal" effort during the testing done by Dr. Puente. Defendant also exhibited inconsistent effort during testing performed by Dr. Rumer, one of the State's experts. For example, during testing Defendant sometimes answered more difficult items correctly, only to answer easier test questions incorrectly. Defendant's less than optimal effort during testing contributed to lowering his scores on the tests administered by the experts examining him.

25.     There is no credible evidence that Defendant experienced or exhibited delusions, hallucinations or distractions by internal stimuli such as psychotic ideas or thought disorder. Further, Defendant was not incoherent

or disoriented.

26.     There was no credible evidence that at the time the Defendant made his statement he was under the influence of any impairing substance. Defendant was prescribed Zoloft, an antidepressant, months after his interrogation and after being held in secure custody on a first degree murder charge for a substantial period of time. There is no credible evidence before the court the Defendant suffered from depression or any other mental health disorder not otherwise specifically addressed in these findings at the time of his interrogation.

27.     David Bartholomew, a psychiatrist and medical doctor at Central Regional Hospital, testified as an expert in forensic psychiatry with a subspecialty in child adolescent psychiatry.  Dr. Bartholomew examined Defendant in 2008. Bartholomew focused on Defendant's understanding of the criminal legal process and the roles of various participants in that process.  In response to Bartholomew's questioning Defendant, then at the age of fifteen, knew that he was charged with first degree murder, that he was accused of killing someone, that this was a serious charge and that he could receive life in prison for murder if treated as an adult. He understood that he could receive less severe punishment if treated as a juvenile. Defendant knew the difference between a person who was "guilty" and one who was "not guilty". Defendant understood the role of witnesses in trials. He understood that various forms of evidence might support opposing arguments in a case. He knew that the district attorney presented information against a defendant, and that Defendant's lawyer's job was to present information on his behalf and to assist Defendant in his case. Defendant understood that a defendant can potentially provide information to law enforcement in an effort to help themselves. After some education by Dr. Bartholomew, Defendant articulated the basic concept of plea bargaining (i.e., receiving a reduced sentence in exchange for pleading

guilty). He comprehended that the role of a judge is to be neutral between the defendant and the prosecution. Defendant's understanding of these legal concepts was demonstrated in his interview with Dr. Bartholomew after Defendant had been in secure custody facing the charge at bar for a year and a half, [sic] does not necessarily reflect Defendant's level of knowledge at the time of his interrogation and will not be used by the court as evidence of Defendant's legal sophistication or experience at the time Defendant was advised of his Miranda rights. However, Defendant's ability to understand important aspects of the legal process provides some credible and relevant evidence of Defendant's general intelligence level.

¶ 10 Lastly, the trial court made findings of fact regarding defendant's capacity to understand the *Miranda* warning:

27.[2]  Defendant had at least a general ability to recall, or memory of, especially important events including who was present at such events.

28.  Defendant demonstrated an ability to recall information between interview sessions six (6) days apart conducted by Dr. Bartholomew.

29.  Defendant's ability to concentrate and pay attention was generally within normal limits.

30.  Defendant had the ability to develop complex themes and switch concepts.

3l.  There is no credible evidence from any form of medical imaging, such as a CAT scan, that the Defendant suffers from any organic brain injury.

32.  Dr. Puente's opinion that the Defendant probably

---

2 There are two findings of fact numbered as 27.

did not understand his Miranda Warnings because of his not understanding the legal system in the United States; limited appreciation of the words used in either English or Spanish, and limited cognitive abilities is not credible.

33.     Defendant's mental state, illness or defect did not impair the Defendant's ability to understand the warnings given or the nature of his Miranda Rights pursuant to NCGS § 7B-2101.

34.     Defendant evidenced an ability to be evasive and appreciative of his position in relation to legal authority and jeopardy by initially denying to Sheriff Carter and Detective Holly his true identity, providing a false name and later taking them to a wrong address as his home. All of these conversations, including later when the Defendant volunteered to show Detective Holly where Defendant had put the gun being sought, were in English. Defendant also disposed of the murder weapon outside his uncle's house. Defendant led Sheriff Carter and Detective Holly directly to the gun he had hidden 20-30 feet in the woods and did so without confusion. Even before being advised of his rights, the Defendant's conduct showed he understood that speaking to the police could have negative consequences. Defendant sought to manipulate and mislead law enforcement. Defendant possessed and exhibited the mental capacity to understand the meaning and effect of statements made by him to the police.

35.     Defendant appeared to exhibit some understanding of English by starting to answer before the interpreter was finished translating some of the questions during his interrogation.

36.     During questioning Defendant stated he would tell the interpreter what happened but would not tell Detective Clint Babb directly. Defendant was told, and understood, that whatever he said to the interpreter would be repeated to Detective Babb by the interpreter. Defendant chose to

make a statement to the interpreter without anyone other than the interpreter present. Defendant understood he was not required to speak directly to law enforcement officers, or speak to anyone, if he did not wish to do so. Defendant later also gave a complete statement to Detective Babb.

37.     The findings of fact above describe Defendant's circumstances and abilities <u>at the time of his interrogation</u> at age 13, and not at a later time.

(Emphasis in original.)

¶ 11          The trial court then concluded,

1.     At the time of his interrogation at age 13, Defendant suffered from a mental defect in the form of a below average or borderline intelligence. However, the credible evidence does not support the conclusion or finding that Defendant was "intellectually impaired" or "mentally retarded".

2.     Defendant's mental state, illness or defect did not impair his ability to make a knowing, voluntary and intelligent waiver of his rights pursuant to NCGS 7B-2101. Likewise, the Defendant's mental state, illness or defect did not prevent him from understanding these rights or from appreciating the consequences of waiving these rights.

3.     Defendant had the capacity, at age 13 and at the time of his encounter with law enforcement in this case, to understand the warnings given to him, the nature of his Fifth Amendment and statutory rights, and the consequences of waiving his rights. Defendant in fact understood each and all of these rights and warnings and the consequences of waiving them. Defendant made a rational and voluntary decision to waive each and all of his rights.

4.      Even if Defendant was "mentally retarded" or "intellectually impaired", as these terms are defined by statute or in the field of psychology or psychiatry, Defendant nevertheless in fact had the capacity, at the time of his interrogation, to understand the warnings given to him by law enforcement, the nature of these rights and the consequences of waiving his rights, and Defendant still in fact understood these rights, their nature and the consequences of waiving them and in fact made a knowing, intelligent and voluntary waiver of his rights.

5.      Considering the totality of the circumstances, including Defendant's mental defect, age, experience, education, background and intelligence, the Defendant made a knowing, voluntary, willing, understanding and intelligent waiver of his properly advised juvenile rights under NCGS § 7B-2101.

6.      Under the totality of the circumstances, Defendant made a knowing, intelligent, willing, understanding and voluntary waiver of his <u>Miranda</u> and juvenile rights under the fifth, sixth and fourteenth amendments to the U.S. Constitution, and of his rights under Article l, sections 19 and 23 of the N.C. Constitution. There were no substantial violations of Defendant's rights under the North Carolina General Statutes.

7.      The. State has met its burden of proof in establishing each of the findings and conclusions set forth above.

8.      The statements made by Defendant were knowingly, willingly, freely, intelligently, voluntarily and understandingly made.

9.      The parties  had proper notice of the hearing of this matter, and the court has jurisdiction over the subject matter and the parties.

Ultimately, the trial court again denied defendant's motions to suppress. Defendant appeals.

## II. Understanding *Miranda* Warnings

¶ 12        Defendant first contends that "where no expert opined that . . . [he] could understand *Miranda* warning, the trial court erred by finding that [he] understood." (Capitalization altered.) Defendant contends the trial court should have allowed his motions to suppress.

> It is well established that the standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting. In addition, findings of fact to which defendant failed to assign error are binding on appeal. Once this Court concludes that the trial court's findings of fact are supported by the evidence, then this Court's next task is to determine whether the trial court's conclusions of law are supported by the findings. The trial court's conclusions of law are reviewed *de novo* and must be legally correct.

*State v. Campbell*, 188 N.C. App. 701, 704, 656 S.E.2d 721, 724 (2008) (citations, quotation marks, and brackets omitted).

¶ 13        We specifically addressed the denial of defendant's motion to suppress, as a juvenile, in *Benitez I*,

> North Carolina General Statute § 7B-2101(d) includes an additional requirement before evidence of a statement by a juvenile may be admitted as evidence: "Before admitting into evidence any statement resulting

from custodial interrogation, the court shall find that the juvenile knowingly, willingly, and understandingly waived the juvenile's rights." N.C. Gen. Stat. § 7B-2101(d) (2007).

To determine if a defendant has "knowingly and voluntarily" waived his right to remain silent, the trial court must consider the totality of the circumstances of the interrogation, and for juveniles, this analysis includes the "juvenile's age, experience, education, background, and intelligence, and [evaluation] into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights":

> [T]he determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel.
>
> This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved. We discern no persuasive reasons why any other approach is required where the question is whether a juvenile has waived his rights, as opposed to whether an adult has done so. The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Benitez I*, 258 N.C. App. 491, 509-510, 813 S.E.2d 268, 279-80 (alterations in original).

Ultimately, in *Benitez I*, this Court remanded for further findings of fact regarding

the totality of the circumstances surrounding defendant's understanding of the

*Miranda* warning provided to him. *See id.* at 515, 813 S.E.2d at 283. Yet even at

the time of *Benitez I*, approximately four years ago, we noted:

> This case has gone on for a long time. When it started, defendant was a 13 year old child. When defendant entered his plea, he was nearing his 20th birthday. At the time of the filing of this opinion, defendant is 24 years old. Nonetheless, we must remand for the trial court to make additional findings of fact addressing whether defendant's waiver of rights *at age 13* was knowing and intelligently made, taking into account the evidence regarding defendant's "experience, education, background, and intelligence" and evaluation of "whether he has the capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving these rights." *Id.* These considerations under *Fare* are not technicalities but are essential to any conclusion of whether defendant knowingly and intelligently waived his right to remain silent. *See generally id.* The trial court's order did not properly address the constitutional arguments before it in defendant's motion to suppress, and thus remand is necessary at this late stage in defendant's ongoing criminal proceedings. Certainly the trial court may consider later evaluations and events in its analysis of defendant's knowing and intelligent waiver at age 13 but should take care not to rely too much on hindsight. Hindsight is reputed to be 20/20, but hindsight may also focus on what it is looking for to the exclusion of things it may not wish to see. The trial court's focus must be on the relevant time period and defendant's circumstances at that time as a 13 year old boy who required a translator and who suffered from a

"mental illness or defect" and not on the 10 years of litigation of this case since that time. The trial court must make findings as to defendant's mental state and capacity to understand the Miranda warnings at age 13, including the nature of his "mental illness or defect[,]" and the impact, if any, this condition had on his ability to make a knowing and intelligent waiver. See *generally id.*

*Id.* at 514–15, 813 S.E.2d at 282–83 (alterations in original).

¶ 14    In defendant's argument he does not directly challenge the trial court's findings of fact but rather contends that the trial court was not in a position to make certain findings because it needed specific expert testimony on certain issues. For example, the trial court found in finding of fact 18 that

> [t]he totality of the credible evidence does not support a finding that Defendant suffered from significant limitations in adaptive functioning in two or more adaptive skill areas. The totality of the credible evidence does not support a finding that Defendant had significant limitations in communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure skills or work skills at the time he was questioned by law enforcement.

Defendant contends "[t]he trial court's conclusion that Juan did not suffer from adaptive deficits is unsupported. (FF 18) . . . The trial court was not qualified, on its own, to make this determination." But the trial court did not simply decide on its own that defendant does not suffer from adaptive deficits, as defendant frames it, but rather found that "[t]he totality of the credible evidence does not support a finding" that defendant suffers from adaptive deficits. *See generally Kabasan v. Kabasan*, 257

N.C. App. 436, 457, 810 S.E.2d 691, 705 (2018) ("Questions of credibility and the weight to be accorded the evidence remain in the province of the finder of facts." (citation and quotation marks omitted)). In other words, the trial court did not independently determine defendant has no adaptive deficits, but rather considered the expert testimony presented by both defendant and the State, determined the credibility and weight of the evidence, and found the credible evidence did not support defendant's contentions regarding the extent of his adaptive deficits.

¶ 15          Primarily, defendant's argument reiterates facts already established in *Benitez I*: defendant was a juvenile; he was from El Salvador; and he had "intellectual limitations." *See generally Benitez I*, 258 N.C. App. 491, 813 S.E.2d 268. As to a need for further expert testimony to support the trial court's determinations, defendant essentially argues that because the trial court had testimony from Dr. Puente that defendant did not understand his *Miranda* rights; the State was required to affirmatively establish through expert testimony, that defendant did in fact understand his rights and subsequent waiver of them. But defendant essentially acknowledges the fallacy of his own argument by correctly noting in his brief, "The State is not necessarily required to present expert testimony to prove validity of a rights waiver." Indeed, defendant fails to direct us to any law requiring an expert to testify he understood the *Miranda* warnings; this is a question of law for the trial court to address based upon the evidence presented by both sides. *See State v.*

*Nguyen*, 178 N.C. App. 447, 452, 632 S.E.2d 197, 201–02 (2006) ("We must now determine whether these findings support the trial court's conclusion that defendant's Miranda waiver was understandingly, voluntarily, and knowingly made. The trial court's conclusion of law that defendant's statements were voluntarily made is a fully reviewable legal question. The court looks at the totality of the circumstances of the case in determining whether defendant's confession was voluntary." (citation, quotation marks, and brackets omitted)).

¶ 16        Whether a defendant knows and understands his rights is a legal question to be answered by the trial court. *See State v. Hunter*, 208 N.C. App. 506, 511, 703 S.E.2d 776, 780 (2010) ("A trial court's findings of fact regarding the voluntary nature of an inculpatory statement are conclusive on appeal when supported by competent evidence. However, a trial court's determination of the voluntariness of a defendant's statements is a question of law and is fully reviewable on appeal. Conclusions of law regarding the admissibility of such statements are reviewed de novo. The standard for judging the admissibility of a defendant's confession is whether it was given voluntarily and understandingly. Voluntariness is to be determined from consideration of all circumstances surrounding the confession." (citations and quotation marks omitted)).

¶ 17        While defendant focuses heavily on his age in his argument, we note that this factor was already addressed by the trial court as noted in *Benitez I*:

The findings of fact in the motion to suppress *do* address defendant's age and the circumstances surrounding the interrogation, but not defendant's experience, education, background, and intelligence or whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Benitez I*, 258 N.C. App. at 514, 813 S.E.2d at 282 (emphasis in original) (citation, quotation marks, and brackets omitted). As to defendant's background, education, and experience, the trial court found:

> 8.      Defendant was born in El Salvador, Central America and came to the United States in 2005. Defendant was transported to the United States at the behest of his family by a "coyote", a person hired to smuggle undocumented immigrants into the United States. Defendant experienced physical abuse while living in El Salvador. Defendant reported receiving blows to the head in El Salvador.
>
> 9.      At the time the Defendant gave his statement, while still in his thirteenth (13th) chronological year, he was actually just two (2) months and a day shy of his fourteenth (14th) birthday.
>
> 10.     After coming to the United States, the Defendant had been enrolled in and attending public school in the English as a Second Language program in Lee County, North Carolina for at least one (1) year.
>
> 11.     In a school setting for ESL (English as a Second Language), prior to interrogation, Defendant responded to simple directions with appropriate actions.
>
> 12.     Two (2) months prior to making his statement the Defendant had been promoted to the eighth (8th) grade, a grade level appropriate for his age. In the school year

before this incident, Defendant achieved grades of 70 or above in Language Arts 7, Math 7, Art, Technology and Health and P.E. Notes for one of Defendant's classes contained in Defendant's school records for 2007, the year of this offense, state that "This student does not pay attention during class." During the 2006-2007 school year, Defendant exhibited poor disciplinary behavior, such as disrespecting his teachers, use of profanity, calling a female student a bitch, touching a female student's buttocks, tripping another student and skipping class. Defendant was placed in in-school suspension four times and out of school suspensions were imposed three times during the 2006-2007 school year. Defendant's conduct likely affected his school performance to some degree.

13.    Defendant reported to Dr. Bartholomew that he had been "caught in a stolen car with a friend" in a prior incident which occurred before his arrest for first degree murder in the case at bar and that he had received criminal charges as a result. However, there is no credible evidence before the court that Defendant was advised of his <u>Miranda</u> rights for any prior incidents.

14.    Defendant was riding a bicycle alone on or near a street outside the mobile home park where he lived when he was first encountered by law enforcement on August 1, 2007.

15.    Defendant has exhibited manipulative behavior that was goal oriented and rewarding to him.

¶ 18        As to defendant's intelligence level, the trial court made 12 findings of fact

explaining which expert evidence it deemed credible and how that evidence led to the

ultimate finding that defendant was intellectually capable of understanding the

*Miranda* warnings.  Finally, as to defendant's ability to understand *Miranda*, the

trial court found:

27.     Defendant had at least a general ability to recall, or memory of, especially important events including who was present at such events.

28.     Defendant demonstrated an ability to recall information between interview sessions six (6) days apart conducted by Dr. Bartholomew.

29.     Defendant's ability to concentrate and pay attention was generally within normal limits.

30.     Defendant had the ability to develop complex themes and switch concepts.

3l.     There is no credible evidence from any form of medical imaging, such as a CAT scan, that the Defendant suffers from any organic brain injury.

32.     Dr. Puente's opinion that the Defendant probably did not understand his Miranda Warnings because of his not understanding the legal system in the United States; limited appreciation of the words used in either English or Spanish, and limited cognitive abilities is not credible.

33.     Defendant's mental state, illness or defect did not impair the Defendant's ability to understand the warnings given or the nature of his Miranda Rights pursuant to NCGS § 7B-2101.

34.     Defendant evidenced an ability to be evasive and appreciative of his position in relation to legal authority and jeopardy by initially denying to Sheriff Carter and Detective Holly his true identity, providing a false name and later taking them to a wrong address as his home. All of these conversations, including later when the Defendant volunteered to show Detective Holly where Defendant had put the gun being sought, were in English. Defendant also

disposed of the murder weapon outside his uncle's house. Defendant led Sheriff Carter and Detective Holly directly to the gun he had hidden 20-30 feet in the woods and did so without confusion. Even before being advised of his rights, the Defendant's conduct showed he understood that speaking to the police could have negative consequences. Defendant sought to manipulate and mislead law enforcement. Defendant possessed and exhibited the mental capacity to understand the meaning and effect of statements made by him to the police.

35.     Defendant appeared to exhibit some understanding of English by starting to answer before the interpreter was finished translating some of the questions during his interrogation.

36.     During questioning Defendant stated he would tell the interpreter what happened but would not tell Detective Clint Babb directly. Defendant was told, and understood, that whatever he said to the interpreter would be repeated to Detective Babb by the interpreter. Defendant chose to make a statement to the interpreter without anyone other than the interpreter present. Defendant understood he was not required to speak directly to law enforcement officers, or speak to anyone, if he did not wish to do so. Defendant later also gave a complete statement to Detective Babb.

37.     The findings of fact above describe Defendant's circumstances and abilities <u>at the time of his interrogation</u> at age 13, and not at a later time.

(Emphasis in original.)   Defendant has not substantively challenged any of the findings of fact, and thus they are binding on appeal.  *Benitez I*, 258 N.C. App. at 510–11, 813 S.E.2d at 280 ("Defendant does not challenge any of the trial court's findings of fact in the order denying his motion to suppress, so all of its findings are

binding on appeal. *See State v. Osterhoudt*, 222 N.C. App. 620, 626, 731 S.E.2d 454, 458 (2012) ('Any unchallenged findings of fact are deemed to be supported by competent evidence and are binding on appeal.')"). We conclude the trial court followed this Court's instructions in *Benitez I* and has addressed "the key considerations in determining whether defendant had knowingly and intelligently waived his rights during police interrogation[.]" *Benitez I*, 258 N.C. App. at 510–11, 813 S.E.2d at 280. Moreover, the trial court did not need further expert testimony, as defendant contends, to make these determinations.

¶ 19 Defendant's only other argument on appeal is that "even if the trial court could conclude on its own that . . . [defendant] understood Miranda warnings, the trial court still erred." (Capitalization altered.) Despite framing this issue as an error in the conclusions of law, defendant again heavily focuses on the testimony from experts noting, "reliance upon the evaluations by Drs. Bartholomew and Rumer was improper because competency to proceed is very different than understanding one's rights." But once again, defendant acknowledges, "the evaluations took place long after the interrogation. The trial court realized this greatly detracted from the relevance of Dr. Bartholomew's evaluation, stating the court would not use it 'as evidence of [Juan's] legal sophistication or experience at the time [he] was advised of his Miranda rights.' (FF 27(1))[.]" (Alterations in original.) In other words, defendant contends that the trial court should not use evaluations about defendant's competency to stand trial

which were conducted "long after the interrogation," but the trial court considered this factor and explicitly noted it was not using the evaluations for the purpose of determining if defendant understood *Miranda* warnings. The trial court took great care to underline and emphasize that its determinations were based upon defendant's age, experience, intelligence level, and ability to understand *Miranda* warnings at the time of interrogation.

¶ 20      Essentially, defendant contends, the trial court should have viewed the evidence in a light more favorable to him, and ultimately wrongly put the burden on him to prove he was not capable of understanding the *Miranda* warnings provided to him. But this is simply not what occurred; the findings which indicate the trial court did not find specific credible evidence do not, as defendant suggests, shift the burden to him, but rather address which evidence the trial court found credible and which it did not, an act completely within the province of the trial court as finder of fact. *See Kabasan*, 257 N.C. App. at 457, 810 S.E.2d at 705. In addressing defendant's argument regarding further expert testimony, we noted above the numerous findings of fact made by the trial court, in its proper discretion, and we conclude the binding findings of fact do indeed support the trial court's determination that defendant understood the *Miranda* warnings, and thus, the trial court properly denied defendant's motions to suppress. These arguments are overruled.

### III.    Conclusion

Because the trial court considered all factors as directed by *Benitez I* and properly concluded that under the totality of the circumstances, defendant made a knowing and voluntary waiver of his *Miranda* rights when he made a statement to law enforcement, we affirm.

AFFIRMED.

Judges ARROWOOD and JACKSON concur.